Albert E. KUEHNERT, Appellant,

v.

TEXSTAR CORPORATION et al.,
Appellees.

No. 26015.

United States Court of Appeals
Fifth Circuit.

May 9, 1969.

Rehearing Denied and Rehearing En Banc Denied July 2, 1969.

2. In view of our disposition of the case we do not reach South's other contentions.

Seymour Lieberman, Herbert Finkelstein, Houston, Tex., for appellant.

John C. Snodgrass, Richard P. Keeton, Houston, Tex., for the Texstar Corp.

J. Burleson Smith, Eugene B. Labay, San Antonio, Tex., for William T. Rhame; Vinson, Elkins, Weems & Searls, Houston, Tex., Cox, Smith, Smith, Hale & Guenther, San Antonio, Tex., of counsel.

Before ALDRICH*, GODBOLD, and DYER, Circuit Judges.

ALDRICH, Circuit Judge:

■ Plaintiff Kuehnert brought suit in the district court pursuant to section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), and more particularly the Commission's Rule 10b-5,[1] against W. T. Rhame, a former president of Texstar Corporation, a Texas corporation, sometimes hereinafter the company, and against Texstar itself. After interrogatories had been answered and depositions had been taken, both defendants were granted summary judgments of dismissal on the merits. 286 F.Supp. 340. On this appeal no issue is raised as to Rhame's statements, their materiality or falsity, or Kuehnert's reliance and damage. Rhame says that Kuehnert is barred from recovery by his own conduct. The company raises as a separate defense —a matter not reached by the district court—that Rhame's actions were his own personal affair and were not authorized by it.

---

* Of the First Circuit, sitting by designation.

1. Rule 10b-5, 17 CFR 240.10b-5, reads: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

While this rule does not provide for private causes of action, it now seems settled that such will lie, even for defrauded purchasers. Ellis v. Carter, 9 Cir., 1961, 291 F.2d 270; Fischman v. Raytheon Mfg. Co., 2 Cir., 1951, 188 F.2d 783; cf. J. I. Case Co. v. Borak, 1964, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423.

The facts are unusual, but relatively simple. In January 1965 Texstar was negotiating a merger agreement with Coronet Petroleum Company. The Coronet stockholders were to be paid in Texstar stock, the exchange ratio being fixed by a contract signed in March 1965, and based on an independent appraisal of Coronet's assets.[2] Texstar stock in January was selling at around $4.25 a share. Rhame told Kuehnert of the acquisition plans and that Texstar had made some secret discoveries on a very favorable "farmout," as a result of which dividends of $3.00 a year could be expected, and an enormous increase in the value of the stock. Rhame stated that as president, he was having trouble with some of the other directors and stockholders, and that it was to his advantage to keep this information secret while he, and hopefully his friend Kuehnert, bought up enough stock to acquire at least a working control. As a result of this Kuehnert bought on margin a substantial amount of company stock and, because the "farmout" representations were not true, lost it all.

Texstar's stock was listed on the American Stock Exchange. Kuehnert's purchases were on the open market, through brokers, and without personal knowledge of the identity of the sellers. Kuehnert concedes that even though he was not, strictly, an "insider," one who buys on the basis of inside information is what one court has termed a "tippee," Ross v. Licht, S.D.N.Y., 1967, 263 F. Supp. 395, 410, and is, by virtue of Rule 10b–5, obliged to make disclosure to the seller. In re Cady, Roberts & Co., 1961, 40 S.E.C. 907; SEC v. Texas Gulf Sulphur Co., 2 Cir., 1968, 401 F.2d 833, cert. denied, Coates v. S.E.C., 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Concededly he made no such disclosure. The district court held that having himself violated Rule 10b–5, Kuehnert could not invoke it in seeking recovery from the defendants.[3]

Our agreement with the district court on this point renders it unnecessary to discuss certain other obstacles that Kuehnert might face, but lest it be thought that we consider it irrelevant we mention a matter not referred to by the parties, the possible necessity of privity, or what has been described as a "semblance of privity between the vendor and purchaser of the security."[4] If privity is needed, an extensive examination of the facts would be required, involving many ramifications, unexplored in the briefs or by the court below. We do not, however, pursue this matter.

We will also not pause over the fact that with respect to the shares Kuehnert bought between January and March with knowledge that the Coronet merger was to take place, the information he possessed and failed to disclose as to the merger was true and, we would think, material. See List v. Fashion Park, Inc., 2 Cir., 1965, 340 F.2d 457, 462, 22 A.L.R. 3d 782, cert. denied 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60. The precise nicety of Kuehnert's case relates only to purchases made after the proxy material announc-

2. The reorganization was designed to fall under section 368(a) (1) (C) of the Internal Revenue Code of 1954. Coronet would sell all its assets to Texstar for Texstar stock and then, within a year, distribute that stock to its shareholders and dissolve.

3. Kuehnert has alleged no common law action for deceit.

4. See Joseph v. Farnsworth Radio & Television Corp., S.D.N.Y., 1951, 99 F.Supp. 701, 706, aff'd., 2 Cir., 1952, 198 F.2d 883, Ruckle v. Roto American Corp., 2 Cir., 1964, 339 F.2d 24, 28 (dictum), Buchholtz v. Renard, S.D.N.Y., 1960, 188 F.Supp. 888; Donovan, Inc. v. Taylor, N.D.Cal., 1955, 136 F.Supp. 552, 553; but see Brennan v. Midwestern United Life Ins. Co., N.D.Ind., 1966, 259 F.Supp. 673; cf. Cochran v. Channing Corp., S.D.N.Y., 1962, 211 F.Supp. 239; Texas Continental Life Ins. Co. v. Bankers Bond Co., W.D.Ky., 1960, 187 F.Supp. 14, rev'd on other grounds sub nom. Texas Continental Life Ins. Co. v. Dunne, 6 Cir., 1962, 307 F.2d 242. For a discussion of the necessity of a "semblance of privity" when stock is bought on the open market see 3 L.Loss, Securities Regulation 1767–71 (2d ed. 1961).

ing the merger, when all he concealed was the information he had received about the successful drilling and its anticipated financial consequences. Since this information was untrue, we will assume that his then purchases occasioned no harm to anyone but himself.[5] At the same time, the case cannot be as simple as Kuehnert would have it when he argues that it is wrong to circulate false information and therefore he was under a duty *not* to repeat what Rhame had told him.

What we have is a person in fact a dupe, but who believes he is a tippee with a duty to disclose, and who endeavors to take wrongful advantage of his tip. The question must be put at two levels. Is recovery in private Rule 10b–5 actions barred by unclean hands, or by being *in pari delicto?* If so, is an impure heart an equivalent?

█ We have small doubt but that actual illegal conduct should bar recovery. It is true that in certain areas exceptions may exist, as for example, antitrust.[6] *See,* e. g., Perma Life Mufflers, Inc. v. International Parts Corp., 1968, 392 U.S. 134, 88 S.Ct. 1981, 20 L. Ed.2d 982; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; cf. Union Leader Corp. v. Newspapers of New England, Inc., 1 Cir., 1960, 284 F.2d 582, 586–587, cert. denied 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744. The guiding principle is one of policy. In private SEC violates the degree of public interest is not comparable to that made apparent by the triple damage provision; we see no sufficient public interest when the only question is one of accounting between joint conspirators. This view is supported by the availability of an unclean hands defense in actions involving SEC proxy requirements. Gaudiosi v. Mellon, 3 Cir.,

1959, 269 F.2d 873, cert. denied 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157; Studebaker Corp. v. Allied Prods. Corp., W.D. Mich., 1966, 256 F.Supp. 173, 192; *cf.* Union Pac. RR. v. Chicago & N. W. Ry., N.D.Ill., 1964, 226 F.Supp. 400. See also 2 L. Loss, Securities Regulation 955–56 (2d ed. 1961). But *cf.* Stockwell v. Reynolds & Co., S.D.N.Y., 1965, 252 F.Supp. 215. It has been suggested that a true co-conspirator may be deprived of recovery even under the Sherman Act. See Perma Life Mufflers, Inc. v. International Parts Corp., 1968, 392 U.S. 134, 146, 147, 149, 153, 88 S.Ct. 1981, *cf.* Pennsylvania Water & Power Co. v. Consolidated Gas Elec. Light & Power Co., 4 Cir., 1953, 209 F.2d 131, cert. denied 347 U.S. 960, 74 S.Ct. 709, 98 L.Ed. 1104; see Note, In Pari Delicto and Consent as Defenses in Private Antitrust Suits, 78 Harv.L.Rev. 1241, 1244–45 (1965).

We would also have no doubt but that Kuehnert would have been *in pari delicto* had he in fact concealed material information from his vendors. It is irrelevant that Rhame originated the scheme. Rhame, on the assumption that what he told Kuehnert was true, would have violated his duty to the stockholders, and Kuehnert, willingly acquiescing in what seemed a mutually profitable plan, would have taken advantage of precisely that breach and made it effective against the very persons to whom protection was owed. This is not a case of mere knowledge of another party's wrongdoing, without active participation. Can-Am Petroleum Co. v. Beck, 10 Cir., 1964, 331 F.2d 371, 373; Hooper v. Mountain States Sec. Corp., 5 Cir., 1960, 282 F.2d 195, 207–208, cert. denied 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693; In re Calton Crescent, Inc., 2 Cir., 1949, 173 F.2d 944, aff'd sub nom. Manufacturers Trust Co. v. Becker, 338 U.S. 304, 70 S.Ct. 127, 94

---

5. Strictly speaking, this may not have been so, but, again, we need not make the possibly complicated analysis. The assumption we have made is the most favorable to Kuehnert.

6. For cases involving unclean hands in labor disputes see Florida E. C. Ry. v.

Brotherhood of Locomotive Engineers, 5 Cir., 1966, 362 F.2d 482; NLRB v. Fickett-Brown Mfg. Co., 5 Cir., 1944, 140 F.2d 883; Sanders v. De Lucia, S.D.N.Y., 1967, 266 F.Supp. 852, 857, aff'd, 2 Cir., 379 F.2d 550.

L.Ed. 107; Rosenberg v. Hano, 3 Cir., 1941, 121 F.2d 818, 822. Kuehnert's action being entirely voluntary, he could not even assert economic duress, such as may sometimes be an ameliorating factor in antitrust violations.

The only question admitting of real difficulty arises from the circumstance that in actuality, Kuehnert knowing nothing, concealed nothing, and hence did not defraud his vendors. Strictly speaking, he and Rhame cannot be seen as *in pari delicto* even as to intention, since, we will assume, Rhame's only intent was to defraud Kuehnert, while Kuehnert's was to defraud his vendors, a different group of persons. It does not follow, however, that Kuehnert escapes the obligations imposed on a tippee and thus should be permitted to recover.

 In the first place, we are not convinced of any difference in substance between a successful fraud and an attempt. The statutory phrase "any manipulative or deceptive device," 15 U.S.C. § 78j(b), seems broad enough to encompass conduct irrespective of its outcome. The Commission may act under sections 17(a) (1) and 17(a) (3) of the Securities Act of 1933, 15 U.S.C. §§ 77q(a) (1), (3), and under 10(b), involved here, to enjoin a potential fraud or prosecute a fraud that failed, without proof of actual loss to any victim. N. Sims Organ & Co. v. SEC, 2 Cir., 1961, 293 F.2d 78, 80 n. 3, cert. denied 368 U.S. 968, 82 S.Ct. 440, 7 L.Ed.2d 396; Hughes v. SEC, 1949, 85 U.S.App.D.C. 56, 174 F.2d 969; Trussell v. United Underwriters, Ltd., D. Colo., 1964, 228 F.Supp. 757, 767. The absence of actual harm to his vendors, as far as Kuehnert was concerned, was a pure fortuity. Kuehnert's intention differed from Rhame's, but it was no more commendable. In determining whether a plaintiff's hands were unclean equity has customarily looked to intent. Thus, when plaintiff and defendant had conspired together to cheat plaintiff's creditors, and instead the defendant cheated the plaintiff, no relief was given. Ford v. Caspers, N.D.Ill., 1941, 42 F.

Supp. 994, 997–998, aff'd, 7 Cir., 128 F.2d 884. Accord, Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 1945, 324 U.S. 806, 814–815, 65 S.Ct. 993, 89 L.Ed. 1381; New York Football Giants, Inc. v. Los Angeles Chargers Football Club, Inc., 5 Cir., 1961, 291 F.2d 471; Shinsaku Nagano v. McGrath, 7 Cir., 1951, 187 F.2d 753, 758. Although Kuehnert is not seeking equitable relief the doctrine remains applicable, since it expresses a general principle equally suited to damage actions. Union Pac. R. R. v. Chicago & N. W. Ry., N.D.Ill., 1964, 226 F.Supp. 400, 410; cf. Maltz v. Sax, 7 Cir., 1943, 134 F.2d 2, 5, cert. denied 319 U.S. 772, 63 S.Ct. 1437, 87 L.Ed. 1720; 4 J. Pomeroy, Equity Jurisprudence 989 (5th ed. 1941). But cf. Straley v. Universal Uranium & Milling Corp., 9 Cir., 1961, 289 F.2d 370, 373. The tippee should be encouraged to disclose, before trading, what he believes on a reasonable basis to be true, because disclosure allows the free market to probe and evaluate his information, accepting what is true and discrediting what is false. Indeed, had Kuehnert fulfilled his statutory obligations here, it is likely that Rhame would have been immediately exposed and Kuehnert saved from any appreciable harm.

 Although Kuehnert's status as a tippee makes the defenses of unclean hands and *in pari delicto* available, their application rests with the discretion of the court. Precision Instrument Co. v. Automotive Maintenance Mach. Co., *supra;* Republic Molding Corp. v. B. W. Photo Util., 9 Cir., 1963, 319 F.2d 347, 350. The question must be one of policy: which decision will have the better consequences in promoting the objective of the securities laws by increasing the protection to be afforded the investing public. Peoples Sec. Co. v. SEC, 5 Cir., 1961, 289 F.2d 268, 271; List v. Fashion Park, Inc., supra. Common law technicalities are to be avoided, SEC v. Capital Gains Research Bureau, Inc., 1963, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237; A. T. Brod & Co. v. Perlow, 2 Cir., 1967, 375 F.

2d 393, not merely in judging the plaintiff's claim but also in assessing defendant's responses. It is true that if a tippee has no remedy against an insider's private falsehoods, little deterrent against such conduct will exist; the insider may have free rein. But, as against this, there is another danger. If a tippee can sue he has, in effect, an enforceable warranty that secret information is true. It is then he that will have free rein. If what he is told is false, he can recover against his informer. If it is true, he will, of course, be liable to his vendors or vendees, but here he may well be protected by the difficulties of discovery.[7] It may be relatively easy to trace insiders; tippees are another matter.

The growth of 10b–5 actions has not thus far been handicapped observably by the absence of suits by tippees against insiders. Nor do we believe that *in pari delicto* and unclean hands have limited the effectiveness of the proxy regulations. Therefore, in view of the substantial deterrent pressures already felt by the corporate insider, SEC v. Texas Gulf Sulphur Co., *supra*, we think it important that tippees, who present the same threat to the investing public as do insiders themselves, should be offered appropriate discouragement. We conclude that the better choice is to leave upon persons believing themselves tippees the restraint arising from the fear of irretrievable loss should they act upon a tip which proves to have been untrue. Hence the loss must lie where it falls.

Affirmed.

GODBOLD, Circuit Judge (dissenting):

Neither the statute nor the SEC Rules provide for the doctrines of *in pari delicto*

and unclean hands in private 10b–5 litigation. It seems to me inadvisable to import the doctrines into the field.

*In pari delicto* has lost such limited vitality as it had in the antitrust area. In rejecting *in pari delicto* in that field, the Supreme Court said:

We have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes. * * * Both Simpson [v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L. Ed.2d 98 (1962)] and Kiefer-Steward [Co. v. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951)] were premised on a recognition that the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. And permitting the plaintiff to recover a windfall gain does not encourage continued violations by those in his position since they remain fully subject to civil and criminal penalties for their own illegal conduct.

Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 138–

---

7. If the tippee here should be held liable to an innocent third party the most he could obtain from his insider friend would be contribution. 15 U.S.C. §§ 77k(f), 78i(e); 3 L.Loss, Securities Regulation 1737–40 (2d ed. 1961); Douglas & Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 178–81 (1933) (suggesting contribution should be on a purely pro rata basis); see deHaas v. Empire Pet. Co., D.Colo. 1968, 286 F.Supp. 809, 815–816. There is no right to indemnity between those *in pari delicto*. See Handel-Maatschappij H. Albert De Bary & Co. v. Faradyne Electronics Corp., S.D.N.Y., 1964, 37 F.R.D. 357; cf. Behar v. Savard, S.D.N.Y., 1958, 21 F.R.D. 367, 369–370; see generally, 3 L.Loss, Securities Regulation 1829–36 (2d ed. 1961).

39, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982, 990 (1968).

A major premise of the majority in imposing on this vital and developing area of the law a restraint moribund in antitrust law is that the degree of public interest in private SEC actions does not compare to that in antitrust actions. In discussing proxy requirements under the securities laws the Supreme Court has held otherwise:

> Private enforcement of the proxy rules provides a necessary supplement to Commission action. As in anti-trust treble damage litigation, the possibility of civil damages or injunctive relief serves as a most effective weapon in the enforcement of the proxy requirements.

J. I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423, 427–428 (1964).

The massive increase in filings of 10b–5 cases, the publication of textbooks on 10b–5, and the conduct of symposiums for interested attorneys [1] indicate that the private suit will be a major weapon— and may be the most important weapon— in attainment of the policies exemplified by the Act and the Rule.[2]

The majority suggest that the court in its discretion should apply the defenses because this will better promote the objectives of the securities law by deterring tippees. The best way to stop the misuse of confidential information is to discourage the insider-tipster from making the initial disclosure which is the first step in the chain of dissemination. Insiders are relatively a smaller group, and by their positions more likely to know or to be advised by counsel of the allowable limits on their conduct.

The relatively larger class of tippees are persons less likely to know of the prohibitions on insider information. The tippee may be no more than the unsophisticated odd-lot purchaser who is told by his broker over the telephone of "confidential" data on the company and buys a few shares of listed stock relying thereon. The tippee is subject to liability to those *with whom he deals without revealing* what he knows. I recognize that he may be difficult to trace so that his potential liability is not the best of restraints. But to strengthen the restraint against him by insulating from responsibility the insider-tipster seems to me precisely the wrong way effectually to restrain tips *from circulating.*

*In pari delicto,* with its "complex scope, contents, and effects," has proved a hindrance to the enforcement of federal statutory regulations through the medium of "private attorneys general." See Perma-Life Mufflers v. International Parts Corp., *supra.*[3] Application of it, and the unclean hands doctrine, as judicially-imposed restraints on 10b–5 litigation will hinder in similar fashion the effective weapon of the private suit.

---

1. Practicing Law Institute sessions on 10b–5, held in New York and the West Coast, are reported to have had 1,000 lawyers present at each. Financial World, Jan. 15, 1969, p. 28, col. 1.

2. *See* A. Bromberg, *Securities Law: Fraud—SEC Rule* 105–5, § 8.1, at 194 (1968) : "By now it should be clear that private suits pursuant to the implied right of action are the biggest part of 10b–5's development and significance."

3. The majority suggest that *in pari delicto* may be allowable in antitrust litigation where the parties are "co-conspirators" or otherwise are equally guilty. I would not allow even a restricted application

of the doctrine in 10b–5 litigation. First, there are problems of deciding when a party's "badness" is sufficient to warrant the application of *in pari delicto,* which make it almost impossible to create an orderly and consistent body of law on the subject. Second, litigation among guilty parties serves to expose their unlawful conduct and render them more easily subject to appropriate civil, administrative, and criminal penalties. For example, litigation among insiders will often expose the guilty parties to derivative suits by stockholders. The present case presents a highly unusual situation where no profits were made and consequently no derivative suits would be filed.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

See also D.C., 293 F.Supp. 425.

GODBOLD, Circuit Judge (dissenting).

I dissent.